# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================
## NO. 03-04-00173-CV
========================

**The Voice of the Cornerstone Church Corporation, Appellant**

**v.**

**Pizza Property Partners, David J. Miller, John W. Hoberman, John G. Farrar, Exxon Mobil Corporation and ExxonMobil Oil Corporation, Appellees**

================================================================================
## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
## NO. GN001463, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING
================================================================================

## O P I N I O N

In this appeal, we review a permanent injunction enforcing a restrictive covenant to prohibit activities of a church located on the former site of the Austin petroleum "tank farm." Although the backdrop of this appeal involves not only religious but also environmental concerns, the issues properly preserved on appeal and within our power to consider are exclusively these: (1) whether the church, as a purchaser charged with notice, is bound by a restrictive covenant on the property; (2) whether the district court properly determined that the church's use of the property violated the restrictive covenant; and (3) whether the district court could constitutionally enforce a facially neutral and nondiscriminatory restrictive covenant against a church, a proposition that Texas courts have long accepted. Because the district court correctly resolved these issues, we affirm the judgment.

## BACKGROUND

Because the restrictive covenant we consider in this case resulted from a settlement agreement with the former Texas Water Commission concerning remediation of an industrial brownfield, we begin with a brief introduction to the ongoing policy developments in that area of environmental law. Industrial brownfields are abandoned, idled, or underused industrial and commercial sites where expansion or redevelopment is complicated by real or perceived environmental contamination that can add cost, time, or uncertainty to a redevelopment project. *See* Frona M. Powell, *Amending CERCLA to Encourage the Redevelopment of Brownfields: Issues, Concerns, and Recommendations*, 53 Was. U. J. Urb. & Contemp. Law 113, 113-14 (1998). The federal government's emphasis on permanent cleanup of brownfields to leave land available for unrestricted use has gradually faded over time, as the costs and difficulties of achieving such a goal became clear. *See* Jim Spinaastra, et al., *Industrial Controls: Brownfields Superweapon or Ultimate Trojan Horse?*, 15 Nat. Resources & Env't, 104, 104 (2000); *see also* Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. §§ 9601-9675 (West 1995 & Supp. 2004). Among other reasons, this policy shift resulted from concerns of the polluting parties over a requirement to pay the costs to clean their sites to levels safe for residential use when those sites were likely to remain industrial for the foreseeable future. *See* Spinaastra, *supra*, at 104. As a result, the federal government began to encourage the use of land and water-use restrictions to control residential exposure so as to open up previously idle brownfields for industrial redevelopment. *See id*.; *see also* Frona, *supra*, at 113-14. Failure to maintain land restrictions may subject the polluter to liability under CERCLA or state environmental law. *See* Spinaastra, *supra*,

2

at 106. In 1999, Texas implemented rules to reflect this new approach to brownfield redevelopment. *See* 30 Tex. Admin. Code §§ 350.1-.135 (2004) (Texas Risk Reduction Program); *see especially id*. § 350.1 ("The program also sets reasonable response objectives that will protect human health and the environment and preserve the active and productive use of land.").

Before 1992, Mobil Oil, a predecessor to ExxonMobil Oil Corporation ("ExxonMobil"),[1] owned and operated an oil pipeline terminal that served as a bulk fuel storage and transfer station on property near the intersection of Airport Boulevard and Springdale Road in east Austin. Neighbors to the property complained about soil and groundwater contamination, resulting in litigation before the Texas Water Commission, the predecessor agency to the Texas Commission on Environmental Quality (the Commission). In April 1992, all parties to that litigation reached a settlement, which the Commission memorialized in an agreed order. According to the order, the Commission found documented soil and groundwater contamination on the property in violation of state water-quality regulations. The Commission thus ordered Mobil Oil to submit a pollution remediation plan with provisions for quarterly monitoring of the corrective measures.

Although the settlement agreement is not in the record before us, the parties do not appear to dispute that Mobil Oil's duties under the agreement necessitated that it impose a restrictive covenant to prohibit uses that could create environmental risks before selling or transferring the property. Thus, in 1997, Mobil Oil sold the property to Pizza Property Partners by special warranty deed with the following restrictive covenant:

---

[1] In 2001, Mobil Oil became ExxonMobil Oil Corporation after a series of mergers and name changes.

3

As part of the consideration for this conveyance, the Grantee [Pizza Property Partners] for itself, its successors or permitted assigns, covenants and agrees that from the date of this Deed the property shall be used for commercial/light industrial purposes only and neither the property herein conveyed nor any part thereof shall at any time be used for (1) the storage and sale of motor fuels; (2) for residential purposes, healthcare facilities, daycare facilities, schools, playgrounds; (3) that irrigation and drinking water wells shall be prohibited; and (4) that subsurface structures, including without limitation basements and below ground parking but excluding building foundations are prohibited. This covenant shall survive delivery of the Deed and is to run with the land herein conveyed and a similar restrictive covenant shall be inserted in any deed or lease or instrument conveying or demising the property herein conveyed or any part thereof.

For its part, Mobil Oil agreed to continue remediation and monitoring of the property with respect to the petroleum contamination it caused "to the extent required and in a manner approved by the governmental authority exercising jurisdiction over the matter, whether federal, state or local, or its designee." Pizza Property Partners also released Mobil Oil from any liability "related to the existence or migration of petroleum contamination which arose out of" Mobil Oil's use of the property.

Pizza Property Partners and Mobil Oil filed with the Travis County Clerk several other documents memorializing the restrictive covenant. First, they created a "Post-Closing Use Restriction Agreement," reiterating the promises made in the restrictive covenant filed with the special warranty deed. Second, they executed an "Agreement for Access to Premises after Transfer of Title," in which Pizza Property Partners acknowledged that the property had or

may have been impacted by petroleum contamination and that Seller [Mobil Oil] is or will be undertaking, with reasonable diligence, Corrective Action . . . with respect to petroleum contamination caused by Seller's use of the premises which occurred or commenced occurring before closing, if and to the extent required and in the

4

manner approved by the governmental authority exercising jurisdiction over the matter, whether federal, state or local, or its designee . . . .

The parties defined "corrective action" in the document as "active remediation, passive remediation, investigation and/or monitoring of petroleum contamination." Mobil Oil and Pizza Property Partners then agreed that such corrective action would continue until the appropriate governmental authority would advise Mobil Oil that corrective action had been "completed to that authority's satisfaction" or until such time that Mobil Oil would determine that the environmental condition of the property satisfies regulatory requirements. As a result, Pizza Property Partners granted Mobil Oil access to the property to engage in corrective action, agreed to cooperate in the filing of notices and deed acknowledgments, and consented to bind itself and any subsequent purchaser of the property to submit future construction plans to Mobil Oil to accommodate Mobil Oil's corrective action. By its express terms, the agreement indicates that the parties intended to make it binding on all successors-in-interest to the parties.

On January 26, 2000, Pizza Property Partners conveyed the property to the Voice of the Cornerstone Church Corporation ("Cornerstone") by warranty deed with vendor's lien, subject to "any and all restrictions, encumbrances, easements, covenants and conditions" as filed with the Travis County Clerk. The deed did not further elaborate on the restrictive covenant or explicitly refer to the instruments filed with the County Clerk.

Cornerstone is an incorporated religious group organized, according to its articles of incorporation, "to preach the [G]ospel of the [K]ingdom." Its primary expression of this function is by engaging in religious worship. It was formed in 1995, although the congregation had been

5

informally holding services in members' houses earlier. At the time of the deposition of Juan Ramos, Cornerstone's pastor, the church had approximately 75 members but no paid staff.

No party disputes the facts concerning Cornerstone's use of the property. At the time of purchase, the property contained several old industrial warehouses. Cornerstone converted the largest of these buildings into a church sanctuary, removing walls to create a larger space. It also constructed a small kitchen attached to the sanctuary to provide meals for its members on Sundays. It received permits from the City of Austin for those renovations. Cornerstone also created a baptismal pool from one of the tank farm's fuel storage tanks. It removed sand that had filled the hole where the tank had been, mixed the sand with cement, and used the resulting concrete to form the floor and walls of the baptismal pool in the excavated hole. It then tiled the concrete circumference of the hole.[2] Cornerstone did not seek Mobil Oil's permission to engage in any of these renovations or construction projects.

Worship services occur on the property at least four times each week, estimated by Cornerstone to constitute seventeen percent of the property's use. In a smaller building, Cornerstone runs a printing press to provide financial support for the church; it otherwise does not generate a profit. Ramos has also operated an appliance repair shop and retail store on the property to help pay the monthly expenses of the congregation. There is also evidence that some church members have stored inoperable cars on the property for short periods of time.

---

[2] *Cf.* L. Michael White, *From Jesus to Christianity* 442-43 (2004) (noting that earliest known archaeological evidence of Christian church building was converted Roman private residence; members had created assembly hall by removing interior wall between dining room and adjacent chamber and, in another room, also installed baptismal font).

In 2000, after it learned of activity on the property, Mobil Oil contacted Cornerstone to inform it of its belief that Cornerstone's use violated the restrictive covenant. The parties were unable to come to an agreement concerning permitted uses of the property, and, in 2001, ExxonMobil sought to enjoin both Cornerstone's use of the property for church purposes and any further construction projects, alleging that Cornerstone's activities constituted a breach of the restrictive covenant, access agreement, and use-restriction agreement Mobil Oil signed with Pizza Property Partners in 1997. ExxonMobil also sued various other parties, including Pizza Property Partners and the real estate agent who arranged the conveyance of the property to Cornerstone.

The parties filed cross-motions for summary judgment. In its motion, ExxonMobil explicitly sought a permanent injunction enjoining Cornerstone from using the property "for church services or activities related to the Church or anything else other than commercial or light industrial purposes," from using the baptismal pool, and from further violating the restrictive covenant, the post-closing use agreement, and the access agreement. The district court granted ExxonMobil's motion without stating the grounds.

Thereafter, Cornerstone, for the first time, filed a declaratory-judgment counterclaim seeking cancellation or modification of the restrictive covenant based on changed circumstances or ambiguity. It also sought a declaration that ExxonMobil was not entitled to enforce the covenant because ExxonMobil had no legal or equitable interest in the enforcement. Cornerstone also added various new affirmative defenses. ExxonMobil filed a second summary-judgment motion on the grounds that Cornerstone's counterclaim and affirmative defenses were procedurally barred or otherwise foreclosed by the district court's ruling on its first summary-judgment motion, that the

7

declaratory-judgment action was improper because it addressed issues already before the district court, and that each of the affirmative defenses and the counterclaim failed on the merits. Cornerstone filed a cross-motion seeking summary judgment on its counterclaim. The district court granted summary judgment for ExxonMobil without stating the grounds.

After a jury trial on the pending claim between ExxonMobil and Pizza Property Partners,[3] the district court rendered a final judgment incorporating all its previous rulings, and in section 9 of the order it permanently enjoined Cornerstone from "using the property . . . for church services and related fellowship and worship activities or anything else other than commercial or light industrial purposes" and from "using, in any way, the baptismal pool located on the Property." The district court also prohibited Cornerstone from violating the terms of the restrictive covenant, the use-restriction agreement, and the agreement for access to premises. Finally, the district court disallowed "any type of construction activity without first allowing [ExxonMobil] to review any such construction plans to ensure that any such plans accommodate and facilitate the Corrective Action." This appeal followed.

## DISCUSSION

Cornerstone's issues on appeal can be grouped for discussion as follows: (1) ExxonMobil lacked standing to seek enforcement of the restrictive covenant; (2) there is no evidence that Cornerstone violated the "commercial/light industrial" limitation or any other provision of the restrictive covenant; (3) the district court abused its discretion in refusing to cancel or modify the

_____

[3] ExxonMobil's claims against all other parties had been resolved by the end of the jury trial on its claims against Pizza Property Partners.

8

restrictive covenant on the basis of changed circumstances, hardship, latent ambiguity, or equitable estoppel; and (4) enforcement of the covenant, as interpreted, violates Cornerstone's religious freedoms.

**Standing to enforce the restrictive covenant**

Cornerstone contends that ExxonMobil lacks standing to seek enforcement of the restrictive covenant.[4] We disagree.

The issue of standing is a legal question, which we review *de novo*. *Texas Lottery Comm'n v. Scientific Games Int'l, Inc.*, 99 S.W.3d 376, 380 (Tex. App.—Austin 2003, pet. denied). Standing is a component of subject-matter jurisdiction and is therefore essential to a court's power to decide a case. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444-45 (Tex. 1993); *Benker v. Texas Dep't of Ins.*, 996 S.W.2d 328, 330 (Tex. App.—Austin 1999, no pet.).[5] To establish standing, one must show a justiciable interest by alleging an actual or imminent threat of injury peculiar to one's circumstances and not suffered by the public generally. *Benker*, 996 S.W.2d at 330; *see also Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984).

---

[4] In a subheading concerning its argument that ExxonMobil lacks standing, Cornerstone also states that ExxonMobil lacks "capacity." Cornerstone makes no argument concerning capacity, and we thus have no need to analyze it here. *See* Tex. R. App. P. 38.1(h); *Trenholm v. Radcliff*, 646 S.W.2d 927, 934 (Tex. 1983). Moreover, as discussed below, Cornerstone also waived any lack-of-capacity defense by failing to raise it as a ground for denying ExxonMobil's first summary judgment motion and by failing to challenge all grounds upon which the district court may have relied in granting ExxonMobil's second motion for summary judgment.

[5] Standing thus cannot be waived and may be raised for the first time on appeal. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). Accordingly, Cornerstone can challenge ExxonMobil's standing, even though it failed to raise that issue in response to ExxonMobil's first summary-judgment motion.

9

A "restrictive covenant" is a negative covenant that limits permissible uses of land. Restatement (Third) of Prop.: Servitudes § 1.3(3) (2000). The original grantor of the property is entitled to enforce a restrictive covenant on that property. *Eakens v. Garrison*, 278 S.W.2d 510, 514 (Tex. Civ. App.—Amarillo 1955, writ ref'd n.r.e.); *Pierson v. Canfield*, 272 S.W. 231, 233 (Tex. Civ. App.—Dallas 1925, no writ). A restrictive covenant can bind a successor to the burdened land in two ways: as a covenant that runs with the land at law or as an equitable servitude.[6] *TX Far W., Ltd. v. Texas Invs. Mgmt.*, 127 S.W.3d 295, 302 (Tex. App.—Austin 2004, no pet.); *Reagan Nat'l Adver. of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 495 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.). In Texas, a covenant runs with the land when (1) it touches and concerns the land; (2) it relates to a thing in existence or specifically binds the parties and their assigns; (3) the original parties to the covenant intend it to run with the land; and (4) the successor to the burden has notice. *Inwood N. Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987); *TX Far W., Ltd.*, 127 S.W.3d at 302; *see also Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982); *Wayne Harwell Props. v. Pan Am. Logistics Ctr.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ denied); *Panhandle & S.F. Ry. Co. v. Wiggins*, 161 S.W.2d 501, 504-05 (Tex. Civ. App.—Amarillo 1942, writ ref'd w.o.m.). In addition to these fundamental requirements, we are to construe a restrictive covenant liberally "to give effect to its purposes and intent." Tex. Prop. Code Ann. § 202.003(a) (West 1995). Finally, purchasers are charged with notice of the terms of deeds that form an essential link in their chain of ownership. *Cooksey v.*

---

[6] We note that the Restatement advocates abolishing the distinction between "real" covenants and equitable servitudes. *See* Restatement (Third) of Prop.: Servitudes § 1.4 (2000).

*Sinder*, 682 S.W.2d 252, 253 (Tex. 1984); *Westland Oil*, 637 S.W.2d at 908. A purchaser is also charged with knowledge of the provisions and contents of other recorded instruments. *Cooksey*, 682 S.W.2d at 253; *Musgrave v. Brookhaven Lake Prop. Owners Ass'n*, 990 S.W.2d 386, 396 (Tex. App.—Texarkana 1999, pet. denied); *County Flood Control Dist. v. Glenbrook Patiohome Owners Ass'n*, 933 S.W.2d 570, 575 (Tex. App.—Houston [1st Dist.] 1996, writ denied).

It is undisputed that ExxonMobil is Mobil Oil's successor-in-interest and stands in the shoes of the original grantor in this case. Thus, it may enforce the restrictive covenant because we determine that the covenant runs with the land. *See Eakens*, 278 S.W.2d at 514; *Pierson*, 272 S.W. at 233. Pizza Property Partners and Mobil Oil were in privity of estate when the restrictive covenant was created. The special warranty deed conveying the property from Mobil Oil to Pizza Property Partners contained the terms of the covenant, which attempts to make the property unusable for purposes other than commercial or light industrial uses. *See Westland Oil*, 637 S.W.2d at 911. The covenant burdens the property itself, and its terms make clear that Pizza Property Partners and Mobil Oil intended for it to bind future owners of the property. The explicit terms of the covenant also evidence the parties' intention that it run with the land. Finally, the record indicates that the special warranty deed with the restrictive covenant, the post-closing use restriction agreement, and the agreement for access to premises after transfer of title were all properly recorded in Travis County. Thus, Cornerstone is charged with notice of the deed's terms and those of the other agreements made between Pizza Property Partners and Mobil Oil. Accordingly, we find that this restrictive covenant runs with the land and that ExxonMobil properly had standing to seek its enforcement.

11

In response, Cornerstone argues that the restrictive covenant at issue in this case is in the nature of an "easement in gross" and that ExxonMobil lacks standing to seek enforcement because (1) it is not an adjacent landowner, (2) enforcement does not relate to a benefit to adjacent land, and (3) ExxonMobil has no legitimate interest affected by the prohibited activities. Cornerstone appears to confuse easements in gross with easements appurtenant. When a restrictive covenant relates to an easement across a servient estate, that covenant may be characterized as an easement appurtenant. *Bickler v. Bickler*, 403 S.W.2d 354, 359 (Tex. 1966); *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 207 (Tex. 1963). An easement appurtenant generally takes the form of a negative easement: the owner of the servient estate may not interfere with the right of the owner of the dominant estate to use the servient estate for the purpose of the easement. *See Bickler*, 403 S.W.2d at 359; *Drye*, 364 S.W.2d at 207. In contrast, an easement in gross attaches to an individual and is not dependent upon the existence of a dominant estate in land. *Drye*, 364 S.W.2d at 207. The standard Cornerstone suggests for analyzing an easement in gross actually pertains to easements appurtenant. That standard does not apply in this case because ExxonMobil's rights do not attach to a dominant estate. Instead, we will adhere to the well-settled principles for analyzing restrictive covenants, as we have described above. We overrule Cornerstone's challenge to ExxonMobil's standing.

**Interpretation of the restrictive covenant**

Next, Cornerstone argues that the district court incorrectly interpreted the restrictive covenant to bar its church activities because those activities are merely incidental to the commercial use of the property, because the covenant does not specifically exclude church uses from appropriate

uses, and because the baptismal pool was created from "an already existing concrete hole" as opposed to being a new subsurface structure prohibited by the covenant. We disagree.

The grant or refusal of a permanent injunction is ordinarily within the trial court's sound discretion. *Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841, 851 (Tex. App.—Austin 2002, pet. denied); *South Tex. Coll. of Law v. Texas Higher Educ. Coordinating Bd.*, 40 S.W.3d 130, 139 (Tex. App.—Austin 2000, pet. denied). A trial court "abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 801 (Tex. 2002) (quoting *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985)). Because the court issued its injunction as a result of cross-motions for summary judgment, we must also bear in mind the summary-judgment standards of review when considering alleged error. *See Texas Health Care Info. Council*, 94 S.W.3d at 851.

The standards for reviewing traditional summary judgments are well established: (1) the movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. Tex. R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). The function of summary judgment is not to deprive litigants of the right to trial by jury but to eliminate patently unmeritorious claims and defenses. *Swilley v. Hughes*, 488 S.W.2d 64, 68 (Tex. 1972). Summary judgment will be affirmed on appeal if any ground asserted in the motion

13

for summary judgment is a valid ground for rendering summary judgment. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996). Thus, a party moving for summary judgment must conclusively prove all elements of its cause of action or defense as a matter of law. Tex. R. Civ. P. 166a(c); *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). When both sides have moved for summary judgment and one motion is granted and one denied, we determine all questions presented and render the judgment the trial court should have rendered. *Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 583 (Tex. 2002).

In construing a restrictive covenant, as in construing any written instrument, our first duty is to seek the intention of the parties to give effect to their purposes. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 658 (Tex. 1987). We will give words and phrases used in a covenant their commonly accepted meaning. *Id*. at 657-58. A restrictive covenant may be enforced by injunction where a distinct or substantial breach is shown, without regard to the amount of damages caused by the breach. *Guajardo v. Neece*, 758 S.W.2d 696, 698 (Tex. App.—Fort Worth 1988, no writ); *Shepler v. Falk*, 398 S.W.2d 151, 154 (Tex. Civ. App.—Austin 1965, writ ref'd n.r.e.); *Protestant Episcopal Church Council v. McKinney*, 339 S.W.2d 400, 403 (Tex. Civ. App.—Eastland 1960, writ ref'd). In such cases, it is not necessary to show the existence of any particular amount of damages or to show that the injury will be irreparable. *Shepler*, 398 S.W.2d at 154; *McKinney*, 339 S.W.2d at 403. At least when a covenant restricts the use of property to residential uses, additional uses may be permitted if they are reasonably incidental to prescribed uses and of such nominal or inconsequential breach of the covenants "as to be in substantial harmony with the purpose of the parties in the

14

making of the covenants." *McKinney*, 339 S.W.2d at 404 (quoting *Moore v. Stevens*, 106 So. 901, 904 (Fla. 1925)). A court may interpret and apply provisions of a restrictive covenant on summary judgment when no factual issues exist. *See Crispin v. Paragon Homes*, 888 S.W.2d 78, 80-81 (Tex. App.—Houston 1994, no writ). Cornerstone has insisted that the interpretation of the restrictive covenant here is purely one of law.

Although the restrictive covenant does not, in so many words, prohibit worship services or related church activities, it unequivocally prohibits any use of the property other than "commercial/light industrial purposes." Especially given the brownfield-redevelopment context in which the covenant was created, it was not necessary for ExxonMobil to enumerate with precision every conceivable non-commercial, non-industrial use for that limitation to be effective. Absent some bar to enforcement, we are bound to give effect to the clear intent of the drafters. *Wilmoth*, 734 S.W.2d at 658. Significantly, Cornerstone does not contend that its worship services, baptisms, and similar activities are within the sphere of "commercial/light industrial purposes" permitted under the restrictive covenant.[7] Instead, apparently conceding that these activities violate the covenant,

---

[7] Cornerstone points out that Texas Commission on Environmental Quality Regulations now permit churches to operate on land restricted to "commercial/light industrial" use. 30 Tex. Admin. Code § 350.4(a)(13) (2004); *see also id*. § 350.53 (2004) ("Land Use Classification"). We note that these regulations were promulgated in 1999, two years after Mobil Oil created the restrictive covenant in this case. *See* 24 Tex. Reg. 7436-7766 (1999) (30 Tex. Admin. Code §§ 350.1-.135). In addition, Cornerstone notes that the City of Austin amended its zoning ordinance, reclassifying the property from "Limited Industrial" uses to "Community Commercial-Mixed Use District-Conditional Overlay," effective July 20, 1998. *See* Austin, Tex., Code of Ordinances §§ 25-2-98, 25-2-125 (2005). It argues that this zoning change indicates that the City of Austin has permitted church uses of the property. Although these regulatory and zoning changes might conceivably bear on a changed circumstances analysis, they do not affect our analysis of the intent of the restrictive covenant as drafted, and we do not understand Cornerstone to be contending that they would.

15

Cornerstone urges that church uses nonetheless do not constitute a "direct and substantial" breach because they constitute only a small percentage of the property's uses relative to its commercial enterprises.

Given Conerstone's concession, we must conclude that the church uses are neither nominal nor inconsequential to the permitted "commercial/light industrial" uses. *See McKinney*, 339 S.W.2d at 404 (quoting *Moore v. Stevens*, 106 So. at 904). Cornerstone is organized primarily for religious purposes. All other activity on the property is conducted for the purposes of supporting the church's religious mission—the printing press functions to spread Cornerstone's religious message, and any money earned through the operation of the appliance repair shop is directed to cover Cornerstone's operating expenses. Church services may constitute only seventeen percent of the time the property is used for activities; however, they form the fundamental core of Cornerstone's use of the property. The issue we must address here is not, of course, whether these sorts of religious activities on property are generally permissible or desirable, but whether, on the record before us, Cornerstone's use of the property is a "distinct or substantial breach" of the restrictive covenant's requirement that the property be used solely for "commercial/light industrial" purposes. Our resolution of this issue must rest not on any personal views regarding religious activities but on Texas law. Applying these principles, we conclude that Cornerstone's use of the property for church purposes is a distinct or substantial breach of the terms of the restrictive covenant.

Additionally, we reject Cornerstone's characterization of the baptismal pool as "an already existing concrete hole" that did not violate the restrictive covenant's prohibition of

16

subsurface structures. In restrictive covenants, the word "structure" may be used in a broad sense or in a restricted one. *Stewart v. Welsh*, 178 S.W.2d 506, 508 (Tex. 1944); *De Nina v. Bammel Forest Civic Club, Inc.*, 712 S.W.2d 195, 198 (Tex. App.—Houston [14th Dist.] 1987, no writ). The broad definition of a structure is "any production or piece of work artificially built up, or composed of parts joined together in some definite manner; any construction." *Stewart*, 178 S.W.2d at 508. In a restricted sense, "structure" means "a building of any kind, chiefly a building of some size or of magnificence; an edifice." *Id*. Inclusion of a particular object within the term, or its exclusion therefrom, usually depends upon the context and the purpose sought to be accomplished by the provision of which the term is a part. *De Nina*, 712 S.W.2d at 198.

With this framework in mind, we turn to the language employed in the restrictive covenant: "subsurface structures, including without limitation basements and below ground parking but excluding building foundations are prohibited." Given the brownfield-redevelopment background and the broad language of the covenant, we find that the parties intended the broad sense of the definition to control. Thus, when considering the baptismal pool, we note that it originally was a sand-filled, in-ground, abandoned petroleum tank. Cornerstone removed the sand from the tank, mixed it with cement, and used the resulting concrete to build the walls and floor of the baptismal pool, four-and-a-half feet deep.[8] We conclude that the baptismal pool is a structure under

---

[8] One of our sister courts has held that a concrete slab to be used as a tennis court was not a "structure." *Turner v. England*, 628 S.W.2d 213, 216 (Tex. App.—Eastland 1982, writ ref'd n.r.e.). However, given the context of the covenant in that case, the Eastland court applied the narrow definition of "structure" in coming to its conclusion.

the meaning intended by the parties to the restrictive covenant. The pool may have been easier to construct because Cornerstone only had to dig and remove sand, but that fact does not change its nature as a structure. Cornerstone did not merely use a "hole" that already existed. In addition, Cornerstone does not dispute that the pool is properly characterized as being "subsurface." Thus, the creation of the baptismal pool independently violated the restrictive covenant's prohibition on subsurface structures.

We have found that Cornerstone's church activities violated the restrictive covenant's "commercial/light industrial" use limitation of the property. We have also determined that the construction of the baptismal pool violated the covenant's prohibition on subsurface structures. We overrule Cornerstone's assertion that the district court erred in its interpretation of the restrictive covenant.

**Enforcement of the restrictive covenant**

Having properly interpreted the restrictive covenant to find that Cornerstone had violated its terms, the district court was bound to give it effect unless Cornerstone raised a bar against enforcement. *See Cowling v. Colligan*, 312 S.W.2d 943, 945 (Tex. 1958) (in equity, court may refuse to enforce valid restrictive covenant if proper defense is raised). On appeal, Cornerstone asserts that (1) the district court abused its discretion in refusing to cancel or modify the restrictive covenant on the basis of changed circumstances, hardship, or latent ambiguity, and in rejecting its claim of equitable estoppel; and (2) enforcement of the covenant would violate its religious freedoms.

18

*Cancellation or modification*

Before we can address an issue on appeal, we must adhere to certain bedrock limitations on our judicial power: the issue must have first been raised and properly presented in the trial court and then must actually be raised before us on appeal. Tex. R. App. P. 33.1(a); Tex. R. App. P. 38.1(e), (g), (h). In at least two ways, Cornerstone failed to preserve its arguments regarding changed circumstances, hardship, ambiguity or equitable estoppel. First, Cornerstone did not assert its counterclaim for cancellation or modification until after the district court had granted ExxonMobil's first summary judgment motion, nor did Cornerstone assert any of its affirmative defenses—other than religious freedom—as grounds for denying ExxonMobil's first summary judgment motion.[9] *See Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) (affirmative

---

[9] In its first summary judgment motion, ExxonMobil asserted the grounds that (1) Cornerstone, as a subsequent purchaser charged with notice, was bound by the restrictive covenant; (2) Cornerstone's use of the property constituted a distinct and substantial breach of the restrictive covenant because it did not fall within the requisite "commercial/light industrial purposes"; and (3) Cornerstone's construction activities and use of its below-ground baptismal pool independently violated the restrictive covenant. ExxonMobil explicitly sought a permanent injunction prohibiting Cornerstone from further violating the restrictive covenant, Post-Closing Use Restriction Agreement, or Access Agreement; using the property "for church services and activities related to the Church" or anything else other than commercial or light industrial purposes; or using the below-ground baptismal pool for any purpose. In its response to ExxonMobil's motion, Cornerstone raised the following grounds: (1) it did not directly and substantially breach the "commercial/light industrial use" limitations because it uses the property at least 83 percent of the time to operate its printing business, purchase and resell appliances and other merchandise, and store material for a construction business; (2) the baptismal pool is not a "subsurface structure" violative of the restrictive covenant because Cornerstone merely poured concrete into an existing hole; and (3) the terms of the restrictive covenant do not explicitly prohibit religious meetings and gatherings on the property, and the covenant must be construed in favor of allowing such use. Cornerstone also asserted the first two grounds in its cross-motion for summary judgment but also relied on its affirmative defense that ExxonMobil's interpretation and application of the restrictive covenant "is [v]iolative of the Texas Constitution and the Texas Property Code."

19

defense must be raised with some evidence to avoid summary judgment); *Martin v. First Republic Bank, Fort Worth, N.S.*, 799 S.W.2d 482, 488 (Tex. App.—Fort Worth 1990, writ denied) (counterclaim for reformation or recision of contract obligations not properly filed after court has enforced obligations on summary judgment). In this case, Cornerstone did not raise either its affirmative defenses or its counterclaims until after the district court had already ordered enforcement of the restrictive covenant. That summary-judgment order was a final order for the issues concerning the enforceability of the covenant. *See Martin*, 799 S.W.2d at 488. Thus, Cornerstone waived those claims on appeal.

Second, Cornerstone has failed to properly assert these arguments on appeal. After Cornerstone filed its counterclaim, ExxonMobil sought a second summary judgment on grounds that Cornerstone's claim and affirmative defenses were procedurally barred or otherwise foreclosed by the first summary judgment and that each failed on the merits. The district court granted this motion without specifying the grounds. On appeal, although Cornerstone challenges this ruling by arguing the merits of its counterclaim and some of its affirmative defenses, it does not challenge the ground that its claims and defenses were procedurally barred by the first summary judgment. When an

While the motions were pending, Cornerstone filed amended answers adding affirmative defenses of lack of standing, equitable estoppel, ambiguity, changed circumstances and relative hardship, and that enforcement of the covenant would violate Cornerstone's rights to equal protection, free speech, free exercise of religion, assembly and association under the state and federal constitutions. It also filed a verified pleading purporting to attack ExxonMobil's capacity to enforce the restrictive covenant. But Cornerstone did not raise any of these defenses, other than religious freedom, as grounds for denying ExxonMobil's summary judgment motion and granting its own.

The district court subsequently granted ExxonMobil's summary judgment motion without stating the grounds and denied Cornerstone's motion.

appellant from a summary judgment does not successfully attack every possible ground upon which the district court could have based its summary judgment, the summary judgment must be affirmed. *Grace v. Colorito*, 4 S.W.3d 765, 768 (Tex. App.—Austin 1999, pet. denied). We are thus required to affirm the second summary judgment foreclosing Cornerstone's counterclaim and affirmative defenses. We overrule Cornerstone's issue regarding changed circumstances, hardship, ambiguity, and equitable estoppel.

### Religious freedom

Finally, Cornerstone argues that enforcement of the restrictive covenant violates its rights to religious freedom. As an initial matter, we note that Cornerstone's argument here is a narrow one. Cornerstone contends only that enforcing the restrictive covenant would violate its right of religious freedom and expression under the Texas Constitution by prohibiting religious services and meetings. *See* Tex. Const. art I, § 6. Article I, section 6 provides:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

*Id*. Cornerstone also invokes section 5.026 of the property code. *See* Tex. Prop. Code Ann. § 5.026 (West 2003). However, it does not present any argument concerning that provision separate from its constitutional arguments. We will thus consider them as one argument based on the constitutional

21

principles. Finally, Cornerstone has invoked neither the federal constitution nor the Texas Religious Freedom Act, which was enacted to provide greater protection for religious practices than the federal constitution as currently interpreted. *See* U.S. Const. amend. I; Tex. Civ. Prac. & Rem. Code Ann. §§ 110.001-.012 (West Supp. 2004-05); *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 885 (1990); *City of Boerne v. Flores*, 521 U.S. 507, 512, 529-36 (1997).[10]

Because this dispute thus centers on a constitutional issue, we review the trial court's decision *de novo*. *Strayhorn v. Ethical Soc'y of Austin*, 110 S.W.3d 458, 463 (Tex. App.—Austin 2003, pet. denied); *see also Perry v. Del Rio*, 67 S.W.3d 85, 91 (Tex. 2001). Thus, we owe no deference to the trial court's decision and may proceed to resolve the issues presented as a matter of law. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998).

We echo our sister court in Beaumont in expressing "our complete and wholehearted adherence to and support of" the constitutional principle relied upon by Cornerstone, but we are compelled to reject Cornerstone's contention. *See Ireland v. Bible Baptist Church*, 480 S.W.2d 467, 471 (Tex. Civ. App.—Beaumont 1972, writ ref'd n.r.e.). Texas courts have routinely rejected the notion that a facially neutral, otherwise valid restrictive covenant violates constitutional religious freedom protections if applied against a church. *See, e.g.*, *Calvary Baptist Church v. Adams*, 570

---

[10] Cornerstone did not raise the Texas Religious Freedom Act below in its pleadings, summary-judgment response, or briefing. *See* Tex. Civ. Prac. & Rem. Code § 110.004 (person whose free exercise of religion has been violated under act may assert violation as defense in judicial or administrative proceeding). On appeal, it makes only a single passing reference to the Texas Religious Freedom Act in its brief, characterizing the statute as merely codifying constitutional protections. Thus, we have no occasion here to consider the potential implications of the Act or the merit of ExxonMobil's contention that it does not apply to courts. *See id*. § 110.001(a)(2) (defining "Government agency" to include "any agency of this state . . . including a department"), .002(a) (Act "applies to any . . . order, decision, practice or other exercise of governmental authority.").

22

S.W.2d 469 (Tex. Civ. App.—Tyler 1978, no writ) (upholding temporary injunction that enjoined church from violating residential-use-only restriction until final hearing); *Ireland*, 480 S.W.2d at 470-71; *Protestant Episcopal Church Council v. McKinney*, 339 S.W.2d 400 (Tex. Civ. App.—Eastland 1960, writ ref'd) (affirming injunction against student gatherings and chapel services when building also used as residence for priest); *Calvary Temple v. Taylor*, 288 S.W.2d 868 (Tex. Civ. App.—Galveston 1956, no writ) (halting construction of church on property restricted to buildings for residential use only); *Terrell Hills Baptist Church v. Pawel*, 286 S.W.2d 204 (Tex. Civ. App.—Austin 1956, no writ) (enjoining construction of church and school on property bound by residential-use-only restrictive covenant); *Chandler v. Darwin*, 281 S.W.2d 363 (Tex. Civ. App.—Dallas 1955, no writ) (restrictive covenant limiting construction to residential dwellings interpreted to prohibit use of building for church services).[11] In *Ireland*, for example, the Beaumont court considered a restrictive covenant providing that no structure would be permitted on the property except a detached single-family dwelling. *Id*. at 469. A church later built a sanctuary and a smaller Sunday-school building on the property. *Id*. After a district court denied a request to order the church to remove the buildings, the Beaumont court reversed and ordered the removal of the buildings. *Id*. at 474.

In particular, the *Ireland* court rejected a claim that enforcing the covenant would constitute unlawful discrimination under the Supreme Court's decision in *Shelly v. Kraemer*, 334

---

[11] Cornerstone attempts to distinguish these cases on the basis that each of the restrictive covenants at issue limited the use of the subject property to residential uses, whereas the covenant here limits use of the property to commercial/light industrial uses. We see nothing in any of these cases suggesting that they turn on the residential nature of the covenants' restrictions. Rather, they embody general principles permitting the enforcement of restrictive covenants against churches.

U.S. 1 (1984). *Id*. at 470. In *Shelly*, the Supreme Court had barred judicial enforcement of a restrictive covenant that limited occupation of the property to persons of "the Caucasian race" and restricted occupation of the property from residential use "by people of the Negro or Mongolian Race." *Shelly*, 334 U.S. at 10. Such a covenant could not be enforced, the Court decided, because it constituted "discriminatory action on the part of the States based on considerations of race or color." *Id*. at 23. As the Beaumont court correctly noted, the constitutional problem with the *Shelly* covenant emerged from its discrimination *between* people based on their race. *Ireland*, 480 S.W.2d at 470. Thus, *Shelly* might bar a restriction on religious uses of property if "the restriction applied only to Baptist churches while permitting those of other denominations." *See id*. Because the restriction applied equally to churches of all denominations and faiths, the *Ireland* court determined that it did not unlawfully discriminate against the church. *Id*.

Likewise, the restriction to be enforced here applies equally to the religious activities of all denominations and faiths. Hence, no discrimination claim can be made under Texas constitutional principles. *See id*. Accordingly, enforcement of the covenant does not violate the Texas Constitution.

## CONCLUSION

We have overruled Cornerstone's arguments that ExxonMobil lacked standing to seek enforcement of the restrictive covenant in this case, that the district court improperly interpreted that covenant and that the enforcement of the restrictive covenant violates Cornerstone's religious freedom rights under the Texas Constitution. No other bars to enforcing the restrictive covenant or

24

the district court's injunction have been advanced or preserved. Accordingly, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: March 10, 2005