

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00385-CV

_____

CHARLES GLEN HYDE, NORTHWEST REGIONAL AIRPORT, INC., TEXAS AIR CLASSICS, INC., DREAMSHIPS, INC., AND HYDE-WAY, INC., Appellants

V.

NORTHWEST REGIONAL AIRPORT PROPERTY OWNERS ASSOCIATION, INC., Appellee

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. 16-05997-16

Before Sudderth, C.J.; Meier and Kerr, JJ.
Opinion by Justice Meier

## OPINION

In this latest round of litigation involving the Northwest Regional Airport (Airport), the trial court resolved competing traditional and no-evidence summary-judgment motions against Appellants Charles Glen Hyde, Northwest Regional Airport, Inc., Texas Air Classics, Inc., Dreamships, Inc., and Hyde-Way, Inc. (collectively, the Hyde Parties) and in favor of Appellee Northwest Regional Airport Property Owners Association, Inc. (POA). At the center of the dispute: Whether "Integrated Deed Restrictions" (IDRs) validly amended a slew of preexisting deed restrictions covering many Airport-area properties. At stake: Consolidating the authority to assess fees and maintain the Airport's common areas in the POA.

In their first four issues, the Hyde Parties argue that the trial court erred by denying their motion for continuance and renewed plea in abatement, in ruling on the parties' summary-judgment motions, and by signing a final judgment that awarded the POA greater relief than what it had sought. In their fifth issue, the Hyde Parties challenge the trial court's attorneys'-fees award. Limiting our analysis to the Hyde Parties' dispositive second, third, and fifth issues, we conclude and hold that the IDRs failed to validly amend the prior deed restriction as a matter of law. We will reverse the trial court's judgment, render a summary judgment in favor of the Hyde Parties, and remand the issue of attorneys' fees to the trial court.

## I. BACKGROUND

### A. The land surrounding the Airport is developed and deed restricted

Edna Whyte created the Airport in 1969.[1] Thereafter, at different points in time, different individuals or entities developed and deed restricted different tracts of land surrounding the Airport. Important for purposes of this appeal, the deed restrictions did not employ a uniform procedure for assessing fees to maintain the Airport's common areas—the runway, taxiways, and access or ramp areas.

Whyte's company, the Aero Valley Development Company (AVDCO), developed the land generally located northeast of the Airport. The properties that AVDCO sold granted owners access to the Airport's common areas via an express easement. AVDCO also deed restricted its subdivisions. Of the eight sets of deed restrictions burdening the northeast properties, most call for an Architectural Control Committee (ACC) to collect a fee from the property owners to maintain the Airport's common areas. Seven of the deed restrictions can be amended when "an instrument signed by a majority of the then record owners of the property has been recorded."

Hyde-Way acquired the Airport in 1982 and is the current owner. Hyde-Way also acquired and partially developed a 119-acre tract generally located northwest of the Airport. Like AVDCO, Hyde-Way imposed deed restrictions on the properties it sold, but instead of conveying easements to access the Airport's common areas, Hyde-Way's deed restrictions afforded property owners access to the common areas

---

[1] The privately-owned airport was originally called the "Aero Valley Airport."

via a "Runway and Taxiway License."[2] And instead of paying a fee to a committee to maintain the common areas, property owners with a license agreement paid Hyde-Way an annual license fee. But similar to the AVDCO restrictions, the Hyde-Way restrictions can be amended by "an instrument signed by a majority of the then property owners of record."

A number of third parties developed and deed restricted several areas generally located in the southern half of the Airport.[3] According to the POA, by 2016, almost all of the lots located in that area were burdened by some form of Hyde-Way's deed restrictions.[4]

## B. Concerns about neglected runway maintenance spawn the IDRs

The ACC "disbanded long ago," and the POA claims that Hyde allowed the Airport's runway "to fall into a severe state of disrepair," using the license fees not to maintain the Airport's common areas but to "pay salaries to himself and his spouse to supplement their incomes." A number of concerned property owners consequently devised a plan "to create a uniform system of airport governance with authority to assess fees and maintain the runway." The plan principally involved (1) amending all of the preexisting deed restrictions covering the Airport-area properties to consolidate

---

[2]The license agreement was an addendum to the Hyde-Way deed restrictions.

[3]It appears that these parties included, among others, Triangle Aviation, Inc., Cole Aviation, Inc., and Dean W. Henry.

[4]Formed in 1985, the POA is a tax exempt, nonprofit corporation.

4

the authority to assess fees and maintain the Airport's common areas in the POA and (2) amending the POA's bylaws to authorize it to exercise those duties.

The POA maintains that it achieved both tasks. It claims that a majority of the Airport-area property owners signed the IDRs, which amended all of the preexisting deed restrictions (seven of the eight AVDCO deed restrictions and the Hyde-Way deed restrictions, including the deed restrictions imposed by other developers) by requiring each property owner to pay an annual fee to the POA for the purpose of maintaining the Airport's common areas.[5] The POA also amended its bylaws, permitting its board to exercise those rights and duties prescribed by the IDRs.

## C.  The POA assesses fees and sues the Hyde Parties

Consistent with its newfound authority, the POA assessed fees against the property owners to maintain the Airport's common areas. Hyde, in turn, opined (and published statements reflecting) that the POA lacked the authority to assess maintenance fees. Concerned with the influence that Hyde's actions were having on the POA's ability to collect maintenance fees, the POA sued the Hyde Parties, asserting tort claims and requests for declaratory and injunctive relief. The POA sought several declarations, including that "[t]he delegation of authority to [the POA] was a valid delegation of authority permitted by properly amending the restrictions"

---

[5]The IDRs provide in part, "An annual fee . . . shall be paid by each Property Owner to the Association within thirty (30) days after the date of such statement to provide for proper maintenance of common areas."

5

and that "[the POA] is authorized to oversee, repair, maintain, and provide for the upkeep of the runway, common areas[,] and common facilities at [the Airport], and to assess and collect fees for that purpose according to the terms of the IDRs."

The Hyde Parties answered and counterclaimed for declaratory relief and various torts. They sought certain declarations that were essentially the inverse of the POA's declarations—"[t]he [IDRs] are invalid and unenforceable" and "[t]he [POA] does not have the authority to financially obligate the property owners at the Airport." The Hyde Parties also filed a plea in abatement, arguing that the POA's requested declarations implicated the rights of hundreds of property owners who were not parties to the lawsuit. The trial court denied the Hyde Parties' plea and temporarily enjoined them from disparaging the POA and interfering with its maintenance of the Airport's common areas.

Both sides later agreed to dismiss their respective tort claims and to resolve the remaining claims by cross-motions for summary judgment—traditional motions on their own claims and no-evidence motions on the other side's claims. The trial court ultimately granted the POA's summary-judgment motions, denied the Hyde Parties' motions, and signed a final judgment that declared in part that the IDRs (i) "validly amended the [preexisting] deed restrictions at [the Airport]" and (ii) "validly delegated property owners' authority to [the POA] to maintain, repair, and provide for the upkeep of the runway, taxiways, and ramp areas at [the Airport], and to assess and

6

collect fees for that purpose."[6]  The final judgment also permanently enjoined the Hyde Parties from making certain representations, awarded the POA judgment against several of the Hyde Parties for varying amounts, and awarded the POA attorneys' fees in the amount of $51,348.  The trial court denied the Hyde Parties' motion to modify or for new trial, and this appeal followed.

## II. SUMMARY-JUDGMENT RULINGS

The Hyde Parties' second and third issues challenge the trial court's summary-judgment rulings.  Among their arguments, they contend that instead of conclusively proving that the IDRs were validly amended, the summary-judgment evidence conclusively proved that the IDRs are invalid and unenforceable, thus rendering the POA powerless to assess fees and to maintain the Airport's common areas.  The POA responds that the IDRs validly delegated the authority to maintain the Airport's common areas to the POA.  Fundamental rules of contract construction govern this issue and compel us to agree with the Hyde Parties.

### A. Standards of review

We review a no-evidence motion for summary judgment under the same legal sufficiency standard as a directed verdict.  *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).  The nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims.  *Id.*  In a

---

[6]The trial court also denied the Hyde Parties' motion for continuance, which sought additional time to conduct discovery on several new instruments that the POA attached to its summary-judgment response.

traditional motion for summary judgment, the movant has the burden to show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See id.*; *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). In reviewing either type of summary-judgment motion, we view the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Merriman*, 407 S.W.3d at 248; *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary-judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848. We should then render the judgment that the trial court should have rendered. *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

**B.    Each preexisting deed restriction was not amended by a majority of then record property owners**

As alluded to above, each deed restriction that the IDRs purported to amend could be amended only by a majority of the then record owners of the properties.[7] To prove that it obtained the requisite number of signatures, the POA's summary-judgment evidence included, among other things, (1) the signature pages of the property owners who approved the IDRs—documents that were recorded in the Denton County real property records on May 12, 2016, July 19, 2016, and December 1, 2016; (2) a spreadsheet (Exhibit 18B) that identified each property owner, a legal description of the property, the tax ID, and the set of deed restrictions burdening the property, if any; and (3) the following image (Exhibit 18C), which divided the Airport properties into Northeast, Northwest, and Southern regions and listed the combined percentage of property owners in each region who approved the IDRs:

---

[7]One recital at the outset of the IDRs states, "WHEREAS, with the exception of Restriction VI, all of the other foregoing deed restrictions allow the property owners to amend the restrictions by a majority of the then record owners of the properties."



In their motion for summary judgment, the Hyde Parties identified a number of purported deficiencies with the POA's signature pages. In response, the POA submitted two additional sets of signatures, both filed of record on April 27, 2017, nearly a year after the first instrument containing signatures was recorded.

The Hyde Parties argue that the IDRs are invalid and unenforceable because the POA's summary-judgment evidence failed to conclusively prove that a majority of the then property owners subject to each set of preexisting deed restrictions approved the IDRs. Specifically, they contend,

Neither Exhibit 18(c) nor any other exhibit offered by the POA makes it possible to ascertain whether the POA received the approval of the required minimum number of property owners burdened by a single set of deed restrictions at a particular point in time, reflected in a single instrument, during a time when amendments were allowed under existing deed restrictions.

This argument is broad enough to identify and encompass a fatal flaw in how the POA went about calculating whether a majority of then property owners approved the IDRs. Consistent with the plain and unambiguous language of the preexisting deed restrictions, the appropriate inquiry is not whether a majority of the property owners in each of the Northeast, Northwest and Southern regions approved the IDRs, as the POA calculated and as its Exhibits 18B and 18C reflect, but whether a majority of the then property owners subject to each individual set of deed restrictions approved the IDRs.

The deed restrictions here are restrictive covenants and are subject to the general rules of contract construction. *See* Tex. Prop. Code Ann. § 202.001(4) (West 2014) (defining "restrictive covenant"); *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 280 (Tex. 2018). In construing a restrictive covenant, our primary task is to seek the intent of the parties to give effect to their purposes. *Voice of Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 667 (Tex. App.—Austin 2005, no pet.). Words used in a restrictive covenant may not be enlarged, extended, stretched, or changed by construction. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987). Rather, we give words and phrases their commonly accepted meaning. *Id.* at 657–58.

11

The properties contained in the Northwest part of the Airport are burdened by what appears to be a single set of deed restrictions (HW 1208/944), and by our calculations (utilizing the POA's Exhibit 18B), over 50% of the owners subject to that set of deed restrictions approved the IDRs. But the same cannot be said for the properties located in the Northeast and Southern regions of the Airport. The IDRs purport to amend *seven* different sets of deed restrictions covering the Northeast region of the Airport and over *thirty* different sets of deed restrictions covering the Southern region of the Airport. Each set of deed restrictions burdens a different tract of land.[8] The seven AVDCO deed restrictions contain the following language:

> *These covenants and restrictions* are to run with the land and shall be binding upon all parties and all persons claiming *under them* for a period of . . . ten (10) years, unless an instrument signed by a majority of the then record owners *of the property* has been recorded, agreeing to change *the covenants* in whole or in part. [Emphasis added.]

The summary-judgment record does not contain the deed restrictions burdening the Southern properties, but the POA confirms that most of those properties are subject to some form of the Hyde-Way deed restrictions, which aside from the time periods, contain similar amendment language.

Neither side suggests that this language is ambiguous. Giving it its ordinary meaning, the terms "These covenants and restrictions" and later "the covenants"

---

[8]For example, the deed restrictions contained at Volume 922, Page 478 of the Denton County real property records burden 12.645 acres of the 47.503 acres of land out of the F.M. Woodward Survey, Abstract No. 1420. The deed restrictions contained at Volume 1002, Page 363 burden a different 8.598 acres. The deed restrictions contained at Volume 1070, Page 529 burden a different 2.389 acres.

plainly mean the covenants and restrictions contained in *each individual* deed-restriction document. And the reference to "the property" refers to the unique tract of land burdened by *each individual* set of deed restrictions, identified at the outset of each set of deed restrictions and legally described in an attached exhibit. Appropriately construed, the deed restrictions are amendable by a majority of the then record property owners who are subject to each set of preexisting deed restrictions. The same holds true for the Southern properties.

In its Exhibit 18B, the POA did not calculate the number of property owners who approved the IDRs by determining whether a majority of the then record owners of the properties subject to each particular set of deed restrictions voted to approve the IDRs. If it had done so, the evidence would show that less than a majority of the property owners who are subject to three sets of deed restrictions in the Northeast[9] and to sixteen sets of deed restrictions in the Southern region[10] approved the IDRs. Instead, in both the Northeast and the Southern regions, the POA arrived at its more-than-a-majority figures by combining the total number of property owners who approved the IDRs and then dividing that figure by the total number of property

---

[9]WOE 1112/465, EGW 3083/1, and WOE 1025/830.

[10]HW 2436/746, 94-R0069535, HW-3212/915, HW 1207/267, HW 2004-30142, 1234-509, HW 1208/917, 933/482, 2854-661, HW 1213/595, HW 1207/277, 4172/1330, HW 4229/3190, CC#93R0094951, HW 1556/168, 93-R0089418.

13

owners.[11] The problem with this approach is that it improperly rewrites—or enlarges, extends, stretches, or changes—the plain and unambiguous language of the respective deed restrictions to permit an amendment by a majority of the then record property owners *who are subject to the AVDCO deed restrictions in the Northeast region* or *who are subject to the deed restrictions in the Southern region.*[12]  *See Wilmoth*, 734 S.W.2d at 657.  But no such language exists in the deed restrictions, we cannot infer that construction from any other language in the restrictions, and we are unaware of any other document or rule of law that would allow the POA to read the separate deed restrictions burdening the properties located in either the Northeast or the Southern regions together.[13]  *Cf. Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex. 1984) (providing that separate documents executed at the same time, for the same purpose, and in the course of the same transaction are to be construed together); *Kartsotis v. Bloch*, 503 S.W.3d 506, 516 (Tex. App.—Dallas 2016, pet. denied) ("When a

---

[11]For example, according to its Exhibit 18B, the POA calculated that of 101 lot owners in the Northeast region, 58, or 57.4%, approved the IDRs.

[12]Indeed, in explaining that a majority of property owners approved the IDRs, the POA broke down the numbers as follows:  "Fifty-one of 88 owners *under the Hyde Restrictions* in the northwest (58.0%); fifty-eight of 101 owners *under the AVDCO Restrictions* in the northeast (57.4%); and thirty-two of the remaining 57 property owners in the south (56.1%)." [Emphasis added.]

[13]Nor can we speculate how this plain-meaning construction would lead to an absurd result.  *See Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011) (stating that courts avoid strictly construing an instrument's language if it would lead to absurd results).

document is incorporated into another by reference, both instruments must be read and construed together.").

A majority of the then property owners subject to each set of preexisting deed restrictions failed to approve the IDRs; therefore, as a matter of law, the IDRs are invalid and unenforceable, and the POA lacks the authority to assess fees to maintain the Airport's common areas. The trial court erred by granting the POA's summary-judgment motions and by denying the Hyde Parties' summary-judgment motions. We sustain this part of the Hyde Parties' second and third issues and need not reach their remaining subissues. *See* Tex. R. App. P. 47.1.

## III. ATTORNEYS' FEES

In their fifth issue, the Hyde Parties argue that if we reverse the trial court's final judgment, then we should also either reverse the award of attorneys' fees and award them fees in certain amounts or remand this cause to the trial court to reconsider the attorneys' fees award. Although a party need not prevail to recover attorneys' fees under the Uniform Declaratory Judgments Act, after a declaratory judgment is reversed on appeal, an award of attorneys' fees may no longer be equitable and just. *Boerschig v. Sw. Holdings, Inc.*, 322 S.W.3d 752, 768 (Tex. App.— El Paso 2010, no pet.). Therefore, we will remand the award of attorneys' fees to the

15

trial court for its reconsideration in light of our opinion. We sustain the Hyde Parties' fifth issue in part.[14]

## IV. CONCLUSION

Having sustained part of the Hyde Parties' second and third issues, we reverse the trial court's final judgment and render a declaratory judgment in favor of the Hyde Parties that the IDRs are invalid and unenforceable and that the POA lacks the authority to financially obligate the property owners at the Airport. Having sustained the Hyde Parties' fifth issue in part, we remand this cause to the trial court to reconsider its award of attorneys' fees.

/s/ Bill Meier
Bill Meier
Justice

Delivered: December 20, 2018

---

[14]We need not reach the Hyde Parties' first and fourth issues. *See* Tex. R. App. P. 47.1.

16