# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00027-CV

**WF Property Owners Association, Inc., Appellant**

**v.**

**Waterford Development Partners, L.P., Appellee**

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-21-002370, THE HONORABLE MARIA CANTÚ HEXSEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This suit involves roads owned by a property-owners association within a tract of land that abuts a marina. At issue is whether the tract south of the one with the roads and marina benefits from an express easement burdening the roads.[1] To benefit, the southern tract must come within the words "the land and improvements commonly known as the 'Waterford Marina.'"

WF Property Owners Association, Inc. appeals a summary-judgment ruling that Waterford Development Partners, L.P. (Buyer) was entitled to a declaration that the easement at issue, created in 2014, benefits the more southerly tract, which Buyer contracted to buy from Waterford Lago Vista, LLC (Seller) in 2021. In one appellate issue, the Association contends that the trial court erred by awarding Buyer that declaration and that the court should instead have

---

[1] This appeal involves no claim for any implied easement or easement by necessity. This opinion should not be construed as addressing the availability, if any, of any implied easement or easement by necessity burdening the roads at issue.

rendered a summary judgment in the Association's favor that Buyer take nothing on its request for the declaration.

Because no ordinary person in the relevant context of the creation of the easement in 2014 would reasonably have understood the easement's terms to have extended to benefit the more southerly tract, we reverse the portion of the trial court's judgment that awarded Buyer the declaration at issue and render judgment that Buyer take nothing by its request for that declaration.

**I**

**A**

For the past 15 or so years, the shores of Lake Travis, in western Travis County, have seen significant new residential development. One such area seeing development is called "Waterford," which lies on a peninsula. To Waterford's north is the city of Lago Vista, and to its south is the village of Point Venture. Tracts in Waterford were conveyed to Seller's predecessor-in-interest in 2013 by special-warranty deed (the 2013 Deed). Two of those tracts are relevant here—one comprising roughly 36 acres and containing a marina since about 2008 (the 36-Acre Tract) and the other tract lying to the south of the 36-Acre Tract, comprising just under 52 acres, and lacking the level of development that the 36-Acre Tract has seen (the 52-Acre Tract). While both tracts were being advertised for sale in 2013, a brochure circulated showing an aerial photo of the tracts. In that photo, the 36-Acre Tract is called "Section 4A," and the 52-Acre Tract is called "Section 4B":



The photo shows roads on the 36-Acre Tract and the marina abutting that tract. These roads are private. Their only public-road access comes from a road called Lohman Ford Road.

In 2014, after a period of development on the 36-Acre Tract, Seller's predecessor-in-interest conveyed ownership of the tract's roads to the Association, whose members were to own homes built on the tract's lots. Along with this conveyance of the roads, the predecessor created and reserved an easement appurtenant burdening the roads for the benefit of specified land (the 2014 Easement). The terms of the roads conveyance and of the 2014 Easement were set forth in contemporaneously executed documents—one a deed (the 2014 Deed) and another an easement agreement (the 2014 Agreement). The 2014 Deed defined the land that was to benefit from the easement over the Association's roads.

After the 2014 Deed and the 2014 Agreement were executed, Seller's predecessor-in-interest conveyed the 52-Acre Tract to Seller. Then in 2021, Seller executed a purchase-and-sale agreement to convey the 52-Acre Tract (the PSA). Because of assignments of interest, Buyer acquired the rights under the PSA to buy the 52-Acre Tract from Seller. For purposes of this appeal, we and the parties treat Buyer as enjoying all rights that the original buyer party to the PSA enjoyed.

As part of Seller's obligations under the PSA, Seller was to provide Buyer with a means of accessing the 52-Acre Tract from Lohman Ford Road:

> In order to access Lohman Ford Road from the [52-Acre Tract], [Buyer] requires access across certain roads and streets in the adjacent [36-Acre Tract]. Seller has agreed to provide [Buyer] with a mutually acceptable means of access across such roads and streets, and during the Inspection Period, Seller and [Buyer] shall use commercially reasonable efforts to agree upon the form of such access and to amend this Agreement to incorporate the terms of their agreement herein.

Buyer and Seller came to dispute exactly what this section of the PSA required and what its inclusion meant for the PSA overall. One way in which the parties' dispute manifested was during assembly of the commitment of title insurance by the title company that was assisting with the PSA's transaction. During its work, the title company identified the 2014 Easement—which burdens the Association's roads—as the method by which Seller should carry out its obligation under the PSA to provide Buyer with access from Lohman Ford Road to the 52-Acre Tract. Seller's representatives, however, questioned the title company about whether its interpretation of the 2014 Easement was correct.

4

**B**

Buyer and Seller could not resolve their disputes over the PSA, so Buyer began this suit. It later amended its pleadings to add a request for declaratory relief. In its live pleading, Buyer requested a declaration that the 2014 Easement is an easement appurtenant that benefits the 52-Acre Tract. Because it was adding this request for relief, Buyer said that it also was adding the Association as a defendant in the suit: "As the owner of the [burdened p]roperty, [the Association]'s rights will be affected by the adjudication of this claim, and it has therefore been added as an additional party Defendant."

During the suit, the parties twice cross-moved for full or partial summary judgments. The second time, Buyer and the Association cross-moved on Buyer's request for the declaration about the 2014 Easement. The trial court granted Buyer's motion and denied the Association's. After a final trial on other matters, the court rendered its final judgment. The summary-judgment ruling merged into the final judgment, and in the final judgment's text, the court awarded Buyer a declaration that the 2014 Easement "is a non-exclusive access easement appurtenant that (i) benefits the owner (and successors and assigns, running with the land) of the 52-[A]cre [T]ract . . . and (ii) is for purposes of the dominant estate holder's ingress and egress across" the 36-Acre Tract's roads. The final judgment also awarded, among other items, the specific-performance relief that Seller was to close the transaction contemplated by the PSA.

The Association now appeals the portion of the judgment awarding the declaration about the 2014 Easement, and, originally, Seller appealed the judgment as well.

**II**

The Association in its appellant's brief raised two appellate issues, one of which addresses the summary-judgment ruling about the declaration regarding the 2014 Easement and

5

the other of which addresses whether the PSA was enforceable. That latter issue was presented in detail in Seller's appellant's brief, and the Association in its brief adopted and incorporated by reference all Seller's arguments on the issue. But after Buyer's appellee's brief was filed, Seller moved that its appeal be dismissed, and we granted Seller's motion and restyled this appeal to reflect that the Association was the only appellant left. *See Waterford Lago Vista, LLC v. Waterford Dev. Partners, L.P.*, No. 03-24-00027-CV, 2024 WL 4045780, at *1 (Tex. App.—Austin Sept. 4, 2024, order) (per curiam).

In its reply brief, the Association informed us that Seller had since closed the transaction contemplated by the PSA. The Association therefore said that its appellate issue about the enforceability of the PSA was moot and that only its appellate issue about the declaration concerning the 2014 Easement was left to be decided in this appeal.

In that remaining appellate issue, the Association contends that the trial court erred by awarding the declaration and that we should reverse that portion of the final judgment and render judgment that Buyer take nothing by its request for the declaration.[2] The ruling that the Association attacks was made at summary judgment and was the subject of cross-motions for traditional summary judgment by Buyer and the Association.

---

[2] *See Hunt v. Heaton*, 643 S.W.2d 677, 679 (Tex. 1982) (stating that "the correct judgment" to render when plaintiff's claim failed on its merits was "that he take nothing"); *see, e.g.*, *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 456, 460 (Tex. 1997) (reversing and rendering judgment that claimant take nothing on declaratory-judgment claim in suit in which parties had cross-moved for summary judgment on that claim); *Charlie Thomas Ford, Inc. v. A.C. Collins Ford, Inc.*, 912 S.W.2d 271, 272–73, 275–76 (Tex. App.—Austin 1995, writ dism'd) (reversing declaratory judgment and rendering judgment that declaratory-judgment claimant take nothing on that claim).

*A*

We review a trial court's ruling on a motion for summary judgment *de novo*. *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278 (Tex. 2018). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). When, as here, competing summary-judgment motions are filed, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Tarr*, 556 S.W.3d at 278. In that instance, if the trial court granted one motion and denied the other, we are to decide all questions presented and render the judgment that the trial court should have rendered. *Id.*

The Association's and Buyer's competing positions turn on interpreting the 2014 Deed, which involves an express easement that also is an easement appurtenant. *See Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002). While one of the most essential property rights is the landowner's right to exclude others from the property, landowners may relinquish some of that right "by granting an easement, but such a relinquishment is limited in nature." *Id.* An easement is a nonpossessory interest that authorizes its holder to use property for a particular purpose. *425 Soledad, Ltd. v. CRVI Riverwalk Hospitality, LLC*, 709 S.W.3d 551, 558 (Tex. 2024). An easement appurtenant differs from an easement in gross—easements in gross generally attach to benefit persons, not land, but easements appurtenant attach to the benefited land itself, that is, to a dominant estate, and pass with that dominant estate. *See Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 203 (Tex. 1962); *Voice of the Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 666 (Tex. App.—Austin 2005, no pet.).

For express easements, we apply basic principles of contract interpretation when considering the express easement's terms. *See Marcus Cable Assocs.*, 90 S.W.3d at 700. "Despite

7

the deficits inherent in the use of language, '[w]henever possible, courts must assess adverse arguments and resolve a text's meaning as a matter of law.'" *Board of Regents of the Univ. of Tex. Sys. v. IDEXX Laboratories, Inc.*, 691 S.W.3d 438, 443 (Tex. 2024) (quoting *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 389 (Tex. 2023) (per curiam)). "The interpreting court must decide whether the meaning of the text read in context is genuinely uncertain or whether one reasonable meaning clearly emerges." *Id.* at 443–44.

The 2014 Deed was executed on the same day as the 2014 Agreement, and both documents concern the same purpose of defining and detailing the express easement granted and were executed in the course of the same transaction. As a matter of law then, both documents should be construed as one instrument and read together. *See Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000); *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981). We are to consider all the language in both documents in relevant context and look to the express terms of the documents to determine the easement's scope. *See Southwestern Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 686 (Tex. 2020); *Marcus Cable Assocs.*, 90 S.W.3d at 700–01.

Therefore, the documents' express terms, interpreted according to their generally accepted meaning, are what delineate the purposes for which the easement holder may use the servient estate, here, the Association's roads. *See Marcus Cable Assocs.*, 90 S.W.3d at 701. In the context of express easements, no rights pass by implication except those that are reasonably necessary to fairly enjoy the rights expressly granted, so if a particular purpose is not provided for in the easement grant, then a use pursuing that purpose is not allowed. *Id.*; *see also id.* at 703 ("[I]f a use does not serve the easement's express purpose, it becomes an unauthorized presence on the land whether or not it results in any noticeable burden to the servient estate. Thus, the threshold inquiry is not whether the proposed use results in a material burden, but whether the grant's

terms authorize the proposed use." (internal citations omitted)). While "certain easements may be assigned or apportioned to a third party, the third party's use cannot exceed the rights expressly conveyed to the original easement holder." *Id.* at 700. When an easement's purposes are bound up with accessing particular land,[3] a trial court errs by declaring that the easement permits access to different land than that specified in the grant. *See Clearpoint Crossing Prop. Owners Ass'n v. Chambers*, 569 S.W.3d 195, 201 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("We therefore hold that the trial court erred in declaring that the express easements grant access to the entire Chambers tract. As a matter of law, unambiguous easements like these can only be used to access the land specified in the conveyance; they do not entitle the Chambers to directly access other parts of their tract.").

## B

The relevant language from the 2014 Deed provides that an easement was being created that burdened the Association's roads for certain purposes, including, at issue here, purposes relating to accessing the defined-term "Marina Tract." The parties dispute whether the definition of "Marina Tract" encompasses the 52-Acre Tract.

According to the 2014 Deed's express terms, both the Association and Seller's predecessor-in-interest agreed that the predecessor reserved and retained an easement

across [the Association's roads] for the purposes of

(i) connecting and providing pedestrian and vehicular ingress and egress to [the predecessor-in-interest], its lessees, tenants, invitees and licensees (including, but not limited to, fuel transport trucks and waste service trucks

---

[3] Such easements are sometimes referred to using words like "ingress–egress easement." *See, e.g.*, *In re State*, 629 S.W.3d 462, 464–65 (Tex. App.—Austin 2020, orig. proceeding).

9

serving the Marina Tract) between the Marina Tract (hereinafter defined) and Lohman Ford Road . . . ;

(ii) the construction, installation, placement, operation, maintenance, repair, upgrade and replacement of utility lines, fiber optic lines and fuel pipelines to serve the Marina Tract . . . ;

(iii) providing parking alongside the roadway on [the Association's roads] for the benefit of [the predecessor-in-interest], its lessees, tenants, invitees and licensees; and

(iv) providing for the construction, installation, placement, operation, maintenance, repair, upgrade and replacement of directional and monument signage to the Marina Tract (the "Signage Improvements").

(Spacing and indenting of the numbered items added.)  Both the Association and Buyer accept that the ingress-and-egress purposes of the easement extend only to access from Lohman Ford Road to the Marina Tract, but the parties part ways over what land they believe makes up the Marina Tract.

The 2014 Deed defines "Marina Tract," and crucial within that definition is the phrase "the 'Waterford Marina'":

those certain tracts of real property more particularly described on Exhibit B attached hereto and any tracts of real property adjacent to the tracts shown on Exhibit B that [Seller's predecessor-in-interest] may in the future own and that form a part of the land and improvements commonly known as the "Waterford Marina."

(Bolding removed.)

The tracts that are described in the Exhibit B undisputedly do not include the 52-Acre Tract, but understanding the Exhibit B tracts' location is important context for interpreting what the "Waterford Marina" land is and is not.  The Exhibit B tracts are two of the lots within the 36-Acre Tract, Lots 47 and 48: "Waterford on Lake Travis Section Four A, Block A, Commercial Lot 47 and Block A, Commercial Lot 48, recorded at 200800146 of the Official Public Records of Travis County, Texas."  The next two graphics show those two lots' location relative to the 52-Acre

10

Tract and to the marina structure. The first graphic is taken from Buyer's appellee's brief and points out Lots 47 and 48. The second graphic is taken from Buyer's relevant cross-motion for summary judgment and when aligned with the first graphic shows that the marina structure sits above land submerged by Lake Travis northwest of Lots 47 and 48.

*[The rest of this page is intentionally left blank.]*



"Section 4A"

Lot 47 and Lot 48

"Section 4B" aka "the 52-Acre Tract"

Lohman Ford Road



Phase 4A
43 LOTS
28.82 ACRES

Waterford Marina (80 slips)

Phase 4B
51.92 ACRES

12

The Association and Buyer's dispute over whether the 52-Acre Tract is within the definition of "Marina Tract" turns on interpreting what land is included by the language "any tracts . . . adjacent to [Lots 47 and 48] . . . that form a part of the land and improvements commonly known as the 'Waterford Marina.'"

The set of land and improvements that were "commonly known as the 'Waterford Marina'" is not defined in the 2014 Deed. When an express easement's terms are not specifically defined, they should be given their plain, ordinary, and generally accepted meaning. *Marcus Cable Assocs.*, 90 S.W.3d at 701. That meaning often depends on the context in which the relevant words were being used. *See IDEXX Laboratories*, 691 S.W.3d at 443 (quoting *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018)).

Context is key for many reasons, among which is that the language of an instrument like an easement deed or contract must map onto things in the world. "Context is not . . . confined to the two-dimensional contractual environs in which the words exist but may also encompass the circumstances present when the contract was entered," so "our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *Id.* (quoting *URI*, 543 S.W.3d at 764). We thus may consult an instrument's surrounding facts and circumstances for help in interpreting the instrument's words. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019) (quoting, ultimately, *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). "[W]e ascertain and give effect to the parties' intent expressed in the text, . . . not in the abstract but in the context in which the words appear and were written—the realities they were meant to address." *IDEXX Laboratories*, 691 S.W.3d at 445. Longstanding, and probably self-evident, reasons for courts' consideration of context include the ideas that "words must be translated into things and

facts" and that "[t]here must always be an association between words and external objects." *Sun Oil*, 626 S.W.2d at 731 n.5 (quoting 4 Williston on Contracts § 609 (3d ed. 1961)).

"Thus," an instrument must "be appraised in view of the surrounding circumstances known to the parties at the time of its execution." *Id.* (quoting 4 Williston on Contracts § 609 (3d ed. 1961)). The relevant surrounding circumstances, including those peculiar to some place, are often decisive:

> [T]o put the judge into position for interpreting a writing, . . . if it contains expressions that are peculiar to . . . some special custom of . . . place, he must have them explained in the same way; if it names or describes persons and things unknown to him, he must be informed of them by admissions or testimony; if some expressions are of doubtful meaning in themselves, he may need to be informed of very many circumstances of time and place, under which the instrument was written.

4 Williston on Contracts § 629 (3d ed. 1961) (quoting *Miller v. Fichthorn*, 31 Pa. 252, 258 (1858)).

## C

So, what would an ordinary person at the time of the 2014 Deed's execution have understood "the land and improvements commonly known as the 'Waterford Marina'" to mean? What were, in *Sun Oil*'s words, those external objects? Buyer argues, as it did at summary judgment, that the land of the Waterford Marina encompasses the 52-Acre Tract. The Association argues for a much more limited understanding of the land of the Waterford Marina. We conclude that an ordinary person at the time of the 2014 Deed's execution would not have reasonably understood the land of the "Waterford Marina" to encompass the 52-Acre Tract.

We start by consulting contemporaneous dictionaries. *See Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 692 (Tex. 2022) (using same starting method). In the relevant context, a "marina" is "a specially designed harbor with moorings for pleasure craft

14

and small boats." *See Marina*, New Oxford American Dictionary (3d ed. 2010). Similarly, it is a "waterside facility that has docks, moorings, supplies, and other facilities for small boats." *See Marina*, American Heritage Dictionary (5th ed. 2016). And it is "a dock or basin providing secure moorings for motorboats and yachts." *See Marina*, Webster's Third New International Dictionary (2002). We draw from these definitions the lesson that a marina should involve facilities above submerged land for securing watercraft.[4] And, obviously, because a marina sits atop water, some shore land is needed to access one.

The meaning of "marina" aside, other of the relevant terms in the 2014 Deed's definition are plain enough that they need no extended interpreting: "land and improvements commonly known as." And we take "Waterford" to mean the area of the shores of Lake Travis that is involved in this suit.

Applying the relevant terms to the circumstances surrounding the 2014 Deed, we observe that the idea of allowing access from Lohman Ford Road to the marina, to the submerged land that it sits above, and to the land that includes its parking lot and entrance would make eminent sense to an ordinary person in the relevant context. Making much less sense to that ordinary person, however, would be the idea that the then-undeveloped acreage south of the marina—the 52-Acre Tract—would be included within the existing facilities above submerged land for securing watercraft, the submerged land, and the land leading to the facilities' entrance, that is, "the land and improvements commonly known as the 'Waterford Marina.'"

---

[4] Language from the 2013 Deed supports this view. When that instrument explained the conveyance to Seller's predecessor-in-interest of "the 'Marina Property,'" the grant included both the marina facilities and the submerged land beneath them: "all real property located in Travis County, Texas, commonly known as the Waterford Marina, together with all and singular, all improvements thereon and all rights and appurtenances pertaining thereto, including, without limitation, all of Grantor's interest in . . . all underwater land."

15

We also consult the 2014 Agreement, as part of the same instrument as the 2014 Deed. *See Fort Worth ISD*, 22 S.W.3d at 840; *Jones*, 614 S.W.2d at 98. The 2014 Agreement's terms provide even more support for concluding that an ordinary person in the relevant context of the 2014 Deed would not have understood the terms at issue to include the 52-Acre Tract. The 2014 Agreement implies that the "Waterford Marina" necessarily involves an operating business or similar undertaking:

> [T]he Association agrees to provide on the keypad or other communication device or devices installed at or near the gates a listing for "Marina" and "Waterford Marina" (or any other business or common name that the Marina Tract may use from time to time in holding itself out to third parties) so that lessees, tenants, invitees and licensees of Marina Owner have the ability to communicate with a designee of the Marina Owner for the purpose of gaining access codes and information necessary or convenient to enter or exit the Marina Tract through the Security Gates.

An ordinary person in the relevant context would easily understand that the "Marina" involved an ongoing business or similar undertaking operating the marina facilities. Indeed, Lots 47 and 48 are identified in the 2014 Deed's Exhibit B as commercial lots. The same ordinary person would not as easily understand there to be any connection between the then-undeveloped 52-Acre Tract and any need for an operating business and keypads or communications.

Elsewhere within the 2014 Agreement, the Signage Improvements that the 2014 Deed discusses are elaborated upon, those being the construction, installation, placement, operation, maintenance, repair, upgrade, and replacement of directional and monument signage to the Marina Tract. The 2014 Agreement provides that the easement holder could "design, locate, construct and place within the Association Tract the Signage Improvements; provided, however, that such Signage Improvements must be in such areas as will not unreasonably diminish the aesthetics of the Association Tract" and that the easement holder's plans and specifications for

16

these improvements should be submitted to the Association for its approval. The Association Tract included only the roads at issue. In relevant context, an ordinary person would easily understand these provisions to involve signage directing travelers *to a marina* and would not reasonably understand them to involve signage directing travelers to undeveloped land.

And finally within the 2014 Agreement is the issue of the cost to maintain the roads burdened by the easement. The agreement discusses "Road Improvements," defined as "[a] private roadway, curb cuts, landscaping, and security gates . . . [that] have previously been constructed on the Association Tracts and currently provide pedestrian and vehicular ingress and egress between the Marina Tract and" Lohman Ford Road. Paying to maintain those Road Improvements was, under the agreement, the Association's responsibility: "The Association shall, at its sole cost and expense, maintain, repair, and reconstruct the Road Improvements in a first class condition and in accordance with all laws, ordinances, rules and regulations applicable thereto." An ordinary person in the relevant context would easily understand this requirement as making up for travelers' use of the roads to access the marina facilities, which were within the Association's 36-Acre Tract. The same person would not as easily understand the requirement as making up for travelers' use of the same roads to access undeveloped land that did not house any Association members.

### D

Buyer points to some other of the circumstances surrounding the 2014 Deed at its execution, but they do not change our conclusion that an ordinary person in the relevant context would understand that the land benefited by the 2014 Easement did not include the 52-Acre Tract. *See IDEXX Laboratories*, 691 S.W.3d at 445 (saying that appropriate interpretation of text is one that "clearly emerge[s]" only after full examination of relevant context).

17

Buyer says that just before the 2014 Deed conveyed the 36-Acre Tract's roads to the Association, those roads plus any roadways within the 52-Acre Tract and other roads besides were all owned by Seller's predecessor-in-interest. Then, Buyer explains, the predecessor conveyed the 36-Acre Tract's roads to the Association but reserved the 2014 Easement. Buyer seems to be arguing that the predecessor must have intended for roadways within the 52-Acre Tract to connect to Lohman Ford Road only by the 36-Acre Tract's roads. But whatever the predecessor's intent may have been for the 52-Acre Tract's roadways, the language chosen in the 2014 Deed forecloses this argument from the former unity of ownership of the roads that the 52-Acre Tract must benefit from the 2014 Easement. That is because the relevant definition is tied not only to "the 'Waterford Marina,'" as we have explained, but also to the idea of tracts "that [the predecessor-in-interest] may in the future own."

To understand these words' significance, consider the relevant definition without them. In that hypothetical, the easement appurtenant benefits Lots 47 and 48 "and any tracts of real property adjacent to [Lots 47 and 48] that form a part of the land and improvements commonly known as the 'Waterford Marina.'" Adding "may in the future own" to this definition makes it even *less* likely that the parties intended to include the 52-Acre Tract. The 52-Acre Tract was already owned by the predecessor-in-interest, and omitting "may in the future own" yields a definition that naturally encompasses land that the predecessor-in-interest already owned, so long as the land was appropriately adjacent and was within what was commonly known as the Waterford Marina. Adding "may in the future own" thus points away from land that the predecessor then owned. *See Alstom Power, Inc. v. Infrassure, Ltd.*, No. 03-07-00690-CV, 2010 WL 521105, at *7 (Tex. App.—Austin Feb. 12, 2010, no pet.) (mem. op.) (explaining and applying to contract language "the venerable principle *expressio unius est exclusio alterius*—'the naming

18

of one thing excludes another'"). Buyer's theory thus is not what "clearly emerges," *see IDEXX Laboratories*, 691 S.W.3d at 443–44, when conducting a plain reading of the words in relevant context.[5] *See Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) ("[A]ll the usual 'rules of construction' apply, like the familiar presumptions favoring consistent usage, disfavoring surplusage, and using the plain meaning of undefined terms." (quoting *Perthuis v. Baylor Miraca Genetics Laboratories, LLC*, 645 S.W.3d 228, 236 (Tex. 2022))); *Uptown Cars, Inc. v. Newcastle Mgmt. Tr.*, 715 S.W.3d 825, 838 (Tex. App.—Austin 2024, no pet.) (proper interpretation of easements requires that every provision be given effect).

Buyer also calls out language from the 2013 Deed, which conveyed to Seller's predecessor-in-interest the 36-Acre Tract, 52-Acre Tract, and other property. Buyer argues that this deed's language defines "Marina Property" to include the 52-Acre Tract and makes clear that the 52-Acre Tract was within what was commonly known as the Waterford Marina. But a different view clearly emerges when reviewing the 2013 Deed—the 52-Acre Tract was part of a distinct set of real property conveyed by the deed separate from the real property that included the Waterford Marina. The 2013 Deed conveyed "the Land" and "the Marina Property" (and other interests). The Land is defined as "those certain tracts of real property situated in Travis County, Texas, and described in Exhibit 'A,'" and Exhibit A lists the 36-Acre Tract, the 52-Acre Tract, and others. (Underlining removed.) The Marina Property is defined as "all real property located in Travis

---

[5] The Association provides an interpretation of what tracts adjacent to Lots 47 and 48 would constitute land that Seller's predecessor-in-interest (as of the 2014 Deed's execution) may have in the future owned and that form a part of the land and improvements commonly known as the "Waterford Marina." The Association points to Lots 49 and 50, which abut Lots 47 and 48 and share frontage on the cul-de-sac that Lots 47 and 48 also front and which had not been conveyed to Seller's predecessor-in-interest when it acquired the 36-Acre Tract in 2013. Buyer argues against the Association's proffered interpretation, but we need not decide that issue. It is enough to conclude, as we do, that the 2014 Easement did not benefit the 52-Acre Tract.

19

County, Texas, commonly known as the Waterford Marina, together with all and singular, all improvements thereon and all rights and appurtenances pertaining thereto, including, without limitation, all of Grantor's interest in . . . all air and water rights, and all underwater land." ("Waterford Marina" is not defined in this document either.) Here again we have a definition of land tied to what was commonly known as the Waterford Marina, and, as we have explained, that definition in relevant context did not include the 52-Acre Tract. The 2013 Deed thus distinguishes between the conveyance of the 52-Acre Tract—as part of "the Land"—and that of the marina and its submerged and dry land. The 2013 Deed deepens this distinction when it elsewhere discusses differing sets of rights conveyed concerning the Land as compared to those conveyed concerning the Marina Property, and where the 2013 Deed's language conveyed similar rights concerning both sets of property, it specifies both "the Land and the Marina Property," as in its paragraph (i).

Last among its pre-2014 evidence, Buyer points to a 2013 marketing brochure concerning the 36-Tract, the 52-Acre Tract, and other nearby property and to a 2009 permit, which has since expired, from the Lower Colorado River Authority (LCRA) concerning constructing more marina facilities. Buyer argues from the brochure's description of a portion of the 52-Acre Tract as a potential home to marina facilities yet to be constructed. The brochure says: "There is an existing and operational 80 wet-slip commercial marina located within [the 36-Acre Tract]. . . . Upon future completion, there will be an additional 145-slip marina located within [the 52-Acre Tract]." We first note that the brochure itself discusses the two facilities as separate marinas. But what is more, when juxtaposed with the 36-Acre Tract's extant and operational marina, a marina-to-be in the 52-Acre Tract would not be considered by an ordinary person in the relevant context of the 2014 Deed to be what is "commonly known as the 'Waterford Marina.'" That common knowledge would instead point to the *existing* marina. Much the same goes for

20

Buyer's reliance on the 2009 LCRA permit. Even if it, as Buyer points out, contemplates adding 145 wet mooring slips—what the permit calls the "West Dock"—in addition to the existing 80 wet mooring slips of the marina facilities in the 36-Acre Tract and calls aspects of the contemplated construction "Waterford Marina" or "Waterford on Lake Travis East & West Marina," an ordinary person would not think of both the existing marina and a planned-but-not-realized marina as what was "commonly known as the 'Waterford Marina.'"

Buyer's next arguments move to evidence from 2017 and beyond, so we start by observing that in general, this evidence is less likely to show "the circumstances present when the [2014 Deed] was entered" into. *See IDEXX Laboratories*, 691 S.W.3d at 443. Buyer argues from a 2017 marketing brochure that conceives of development of the 36-Acre Tract and development of the 52-Acre Tract as successive phases of development of a single overall residential subdivision. Buyer argues from that concept that the marketers or their clients must have realized that the 52-Acre Tract's owner already had an ingress–egress easement over the 36-Acre Tract's roads. But we fail to see how that necessarily follows—subdivision development does not require that an ingress–egress easement have been in place for years before the shovel-ready phase of development kicks off. Such an easement reasonably can be acquired closer in time to the beginning of construction. And in any event, the brochure itself (in the last graphic above) flags the 36-Acre Tract's marina as the "Waterford Marina" and identifies nothing marina-wise abutting the 52-Acre Tract. These are surrounding circumstances that remained true from 2014 to 2017— there was only one marina facility.

Buyer then argues from a 2018 marketing brochure, which teases the possibility of building the 145-slip-marina facilities. But the brochure's language is in reality clearly on the other side of the ledger—"the marina," as commonly understood, is the existing one:

21

Located just off Lohman Ford Road in [the 52-Acre Tract,] and *the* 80 slip marina *is in [the 36-Acre Tract].... The marina* includes 2 commercial lots *in [the 36-Acre Tract]* totaling 1.568 acres that have an existing paved parking lot with stairs to *the marina*. There used to be a permit to add 125 additional slips to *the Waterford Marina*, but it did expire and buyer would need to go through LCRA marina permitting. The underwater land in front of this [52-Acre Tract] for the potential additional 125 slips has already been leased from the LCRA.

(Emphases added.)

From further forward in time is Buyer's evidence of the views of the title company that assisted with the transaction contemplated by the PSA. The title company included the 2014 Easement in its commitment for title insurance, believing that the easement benefited the 52-Acre Tract. When Seller objected to its inclusion,[6] personnel for the title company mentioned internally: "What is the issue with adding an access easement as an insured tract that runs with the land? To be honest I've never seen a seller object to this." The title company's personnel's views in this instance are beside the point. The internal discussion rested on believing that Seller's objection was to the broader notion of "adding an access easement as an insured tract that runs with the land" and not to the narrower issue of the title company's interpretation of the extent of the 2014 Easement. We do not believe that the title company's commitment or internal discussions here inform the relevant context of the 2014 Deed at its execution.

---

[6] After, notably, an attorney *for Buyer* had questioned the 2014 Easement's inclusion:

The reservation of easement and easement appear only to pertain to an easement for ingress, egress and access *to the Marina Tract and not to [the 52-Acre Tract]*, which we are buying. Is there . . . something I am missing as to why your underwriter believes these instruments provide access to [the 52-Acre Tract] from Lohman Ford Road?

(Emphasis added.)

22

To this point, we have addressed all the arguments from the parties' regular briefing necessary to render judgment in this appeal. But after regular briefing was completed with the Association's reply brief, filed in September 2024, Buyer moved for leave to file a sur-reply brief and provided us with its proposed sur-reply brief, filed in October 2025. The Association opposes the motion for leave. Even were we to grant leave for this sur-reply brief to be filed, its arguments do not change our conclusion. We deny the motion for leave.

\*     \*     \*

We conclude, as a matter of law, that the land benefited by the 2014 Easement does not include the 52-Acre Tract. An ordinary person in the relevant context of the 2014 Deed would not have understood the deed's terms—"any tracts of real property adjacent to the tracts shown on Exhibit B that [Seller's predecessor-in-interest] may in the future own and that form a part of the land and improvements commonly known as the 'Waterford Marina'"—as extending to the 52-Acre Tract. (Bolding removed.) We therefore reverse the relevant portion of the trial court's judgment, leaving in place the rest of the judgment, which is unchallenged, and render judgment that Buyer take nothing on its request for the declaration.

_____

Chari L. Kelly, Justice

Before Justices Triana, Kelly, and Ellis

Affirmed in Part and Reversed and Rendered in Part

Filed:   January 30, 2026

23